UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| ROBERT L. CASE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:18CV2151 RLW |
| | ) | |
| ANDREW M. SAUL, | ) | |
| Commissioner of Social Security,[1] | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This is an action under Title 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the application of Plaintiff Robert L. Case for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (the "Act"), 42 U.S.C. § 401, *et seq*. Because the Appeals Council denied Plaintiff's Request for Review, the decision by the Administrative Law Judge ("ALJ") is the final decision of the Commissioner. Plaintiff has filed a Brief in Support of Complaint (ECF No. 16), and the Commissioner has filed a Brief in Support of the Answer (ECF No. 21). For the reasons set forth below, the Court affirms the decision of the Commissioner.

### I. Procedural History

Plaintiff protectively filed an application for DIB on February 17, 2016. In the application, he alleged disability beginning December 20, 2015. (Tr. 146) Plaintiff's claims

---

[1] Andrew M. Saul is now the Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Andrew M. Saul should be substituted for Acting Commissioner Nancy A. Berryhill as the Defendant in this suit. No further action needs to be taken to continue this suit by reason of the last sentence of Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

were denied on May 23, 2016 (Tr. 80-84), and he filed a request for a hearing before an ALJ (Tr. 87-88). On February 15, 2018, Plaintiff testified via video for a hearing before the ALJ pursuant to 20 C.F.R. 404.936(c). (Tr. 34-68) In a decision dated May 14, 2018, the ALJ determined Plaintiff had not been under a disability from December 20, 2015 through the date of her decision. (Tr. 10-26) On November 27, 2018, the Appeals Council denied Plaintiff's request for review. (Tr. 1-6) Thus, the ALJ's decision stands as the final decision of the Commissioner.

## II. Evidence Before the ALJ

On February 15, 2018, the ALJ conducted a hearing from Columbia, Missouri. Plaintiff appeared with counsel via video from a hearing office in Creve Coeur, Missouri. The ALJ began by examining Plaintiff. Plaintiff testified that he had a high school education. He said the last time he did any work of any kind was December 22, 2015. He continued to receive some income after that date due to vacation and sick days under the Family Medical Leave Act ("FMLA"). Plaintiff's last date of employment was January 31, 2015. He receives monthly partial retirement payments. Plaintiff also testified that he cashed in his 401(k) after he resigned from his work. (Tr. 36-39)

Prior to Plaintiff's resignation, he had worked various positions at the same production plant. Over the last fifteen years, he worked as a visual and quality control inspector at the end of an aluminum coil production line. During Plaintiff's last two years of employment, he primarily ran the lathe machine that coated the rolls of product. He testified he would occasionally get pulled off of that job and temporarily reassigned to other jobs he was also capable of doing. The vocational expert ("VE"), appearing via telephone, asked several clarifying questions during Plaintiff's testimony. Plaintiff explained he had to set up the lathe machine, which included entering the roll size, running the lathe, checking how much product

had been taken off, checking for defects, and wrapping the product to return to the plant. When the VE asked how much weight Plaintiff would customarily lift, he responded that he would lift sixty-five to seventy pounds at a given time by himself. (Tr. 39-42)

The ALJ next asked questions about Plaintiff's home life. He lives in a single-story house but uses the stairs to his basement on a daily basis. Plaintiff and his wife have two young grandchildren, whom they watch occasionally. He is able to lift his four-year-old grandson (average size for his age) but not his nine-year-old grandson. Since December 2015, Plaintiff has taken a train from St. Louis to visit his youngest son in Overland Park, Kansas. He goes out to restaurants occasionally, about one a week, but testified he finds it hard to relax and concentrate in crowded settings. (Tr. 42-46) When asked what medications he had taken in the last 24 hours, Plaintiff referenced a Medication List. That list shows he takes the following medications on a daily basis: Bupropion HCL and Sertraline for depression; Buspirone for anxiety; Flomax for enlarged prostate; Lisinopril for hypertension; and Nexium for acid reflux. (Tr. 259)

Next, Plaintiff's counsel examined Plaintiff. Plaintiff testified about an incident with his supervisor on December 22, 2015, after other workers made references to Plaintiff's taking medication for his mental health. Plaintiff has sought mental health treatment, including medication, since 2003 or 2004. Additionally, he has had physical health issues in the form of osteoarthritis in both knees. Plaintiff has received cortisone shots for this issue but has only been able to afford one procedure. He has also been hospitalized for diverticulosis (polyps on his intestines that resulted in bleeding) for which he continues to watch what he eats. The medication Plaintiff takes for his enlarged prostate causes him to use the restroom immediately once he feels the urge. He estimated he would require, on average, three to four restroom breaks

during an eight-hour workday. Plaintiff did not think he could stand for more than two hours without a break because of his knees. He opined that he could likely stand for six and a half hours total during an eight-hour workday with breaks to sit. Plaintiff further said he could maybe sit for four of five hours at most in a more sedentary job. (Tr. 46-53)

Plaintiff says his depression and anxiety also impact his life and he sees a mental health professional once a month. He said he feels guilty because he normally would give 100 percent at work. However, now he feels he needs to stay at home in bed for his sanity. He operates model electric "slot cars" on tracks in his basement as an escape. Upon further inquiry by the ALJ, Plaintiff explained that slot cars are small, electric powered model cars that operate on metal tracks. He has built slot car tracks, and accompanying diorama environments, since childhood. (Tr. 55-59)

The ALJ asked Plaintiff about a single reference to his left thumb giving him trouble. Plaintiff testified that he had undergone surgery for carpal tunnel syndrome on both hands about eight years ago. He said he hit his left thumb with a hammer one day at work; however, he never followed up with a medical provider. Plaintiff is right-hand dominant but says his left hand locks up on a daily basis depending on his activities. (Tr. 59-60)

Plaintiff's counsel next asked if Plaintiff lost his health insurance when he stopped working in 2015, and Plaintiff confirmed and said he has not had any health insurance since then. Accordingly, Plaintiff's health care costs are out of pocket. His wife started working the previous year, which helps them a lot financially. Additionally, Plaintiff had sold off collectables he had acquired over the years on eBay. He said they have struggled to keep their house and his wife suffers from Crohn's disease. Plaintiff asserted he would have sought

medical treatment more often – including for his knees – if he had health insurance. Without any insurance, he has prioritized going to his psychiatrist. (Tr. 60-61)

The VE, via telephone, classified Plaintiff's past work as an automatic lathe setter, medium skilled, SVP 6 under the Dictionary of Occupational Titles ("DOT") numbers. The VE noted Plaintiff also reported he performed that job at the heavy level. The VE also classified Plaintiff's past work as general inspector, light, semi-skilled, SVP 4, which he also reported he did at the heavy level. The VE clarified that, based on Plaintiff's testimony, he appeared to perform each job at different times so it was not a combination position under DOT. (Tr. 62-63)

The ALJ asked the VE to assume a hypothetical individual of Plaintiff's age, education, and work history with the ability to work at a medium exertional level but with the following limitations: never climb ladders, ropes, or scaffolds; never be exposed to unprotected heights or hazardous work environments; occasionally climb stairs or ramps; occasionally stoop, kneel, crouch, or crawl; limited to remembering or carrying out simple routine tasks and making simple work-related decisions; not perform production-paced tasks that have strict hourly goals; can have frequent contact with supervisors and co-workers and occasional contact with the public; and be off-task five percent of the workday. The VE testified that such an individual would be precluded from Plaintiff's past work. Elsewhere in the national economy, however, such an individual could work as a machine packer, medium, unskilled, SVP 2; a night cleaner, medium, unskilled, SVP 2; or a laundry worker, medium, unskilled, SVP 2. The ALJ next asked if the same hypothetical individual further limited to frequent use of the left non-dominant hand with regard to fingering or handling would change the ability to perform the jobs listed. The VE responded that such an individual would be precluded from work as a machine packer. However, that individual could work as a bacon skin lifter. (Tr. 63-65)

Plaintiff's counsel next asked the VE if a hypothetical person who required additional unscheduled ten-minute breaks per hour would be precluded from employment. The VE responded that such an individual would be precluded. Upon further questioning, the VE said an individual who needed to miss work one day per month for doctor or other appointments would not be precluded from employment. However, an individual who needed to miss two days per month would have an employment problem. Plaintiff's counsel had no further questions. (Tr. 66)

### III. Medical Evidence

On August 4, 2014, Plaintiff was diagnosed with severe recurrent major depression without psychotic features and placed on a medication treatment plan. (Tr. 310) On October 29, 2014, he was diagnosed with dysthymia and generalized anxiety disorder and prescribed cognitive therapy. (Tr. 341-44) In September 2015, Plaintiff was continuing primary care treatment for major depressive disorder. (Tr. 282) On December 22, 2015, Plaintiff reported to his primary care physician, Dr. Adam F. Fitzgerald, with anger issues and feelings of extreme anxiety and depression after learning his father was diagnosed with Alzheimer's and facing criminal charges, his wife was diagnosed with Crohn's disease, and he was being harassed at work for his mental issues. (Tr. 276)

On December 23, 2015, Plaintiff presented to an emergency room due to his life stressors and reported feeling like he wanted to harm people at work. He was discharged and referred to an Intensive Outpatient Program. (Tr. 375-77) Progress notes dated December 28, 2015, show Plaintiff was participating in group therapy and learning to apply coping skills to everyday problems. (Tr. 383) He continued in the program until he was discharged on February 12, 2016. The discharge notes confirm his diagnoses of moderate recurrent major depressive disorder and

generalized anxiety disorder as well as hypertension, gastroesophageal reflux disease ("GERD"), diverticulosis, sleep apnea, and pneumonia. (Tr. 464-65)

The record also includes treatment notes from Plaintiff's treating psychiatrist, Dr. Ernest Graypel, between July 2016 and September 2017, discussed more fully below.

On November 30, 2015, Plaintiff reported to Dr. Fitzgerald complaining of hand pain and that his hand "locks up." He also reported pain in the knees, noting the right knee was worse than the left. The knee pain increases when Plaintiff rises from a chair, goes up stairs, or straightens the knee from a bent position. Plaintiff also reported some "popping" in the knee. Dr. Fitzgerald observed mild effusion of the right knee, mild crepitation, and limited flexion. (Tr. 278) An x-ray of the bilateral knees revealed tiny right patellar spurs and an unremarkable left knee. (Tr. 318) Dr. Fitzgerald interpreted mild degenerative changes and administered a steroid injection to the right knee to treat the symptoms of osteoarthritis. (Tr. 278) On physical examination of the left thumb, Dr. Fitzgerald noted mild swelling of the first metatarsophalangeal joint, and an x-ray revealed moderate first carpometacarpal osteoarthritis. (Tr. 320)

### IV. Legal Standards

To be eligible for DIB under the Act, Plaintiff must prove he is disabled. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *Baker v. Sec'y of Health & Human Servs.*, 955 F.2d 552, 555 (8th Cir. 1992). The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An individual will be declared disabled "only if his physical or mental impairment or impairments

are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

Under the Act, the Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. §§ 416.920(a), 404.1520(a). "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled." *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (quoting *Eichelberger v. Barnhart*, 390 F.3d 584, 590–91 (8th Cir. 2004)). First, the claimant must not be engaged in "substantial gainful activity." 20 C.F.R. §§ 416.920(a), 404.1520(a). Second, the claimant must have a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities." *Id.* §§ 416.920(c), 404.1520(c). "'The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [his] ability to work.'" *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting *Caviness v. Massanari*, 250 F.3d 603, 605 (8th Cir. 2001)).

Third, the claimant must establish [her] impairment meets or equals an impairment listed in the Regulations. 20 C.F.R. §§ 416.920(d), 404.1520(d). If the claimant has one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history. *Id.*

Before considering step four, the ALJ must determine the claimant's residual functional capacity ("RFC"). 20 C.F.R. §§ 404.1520(e), 416.920(e). RFC is defined as "the most a claimant can do despite her limitations." *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)). At step four, the ALJ determines whether the claimant can

return to her past relevant work by comparing the claimant's RFC with the physical and mental demands of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f), 416.920(a)(4)(iv), 416.920(f); *McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011). If the claimant can still perform past relevant work, she will not be found to be disabled; if the claimant cannot, the analysis proceeds to the next step. *McCoy*, 648 F.3d at 611.

At step five, the ALJ considers the claimant's RFC, age, education, and work experience to see if the claimant can make an adjustment to other work in the national economy. 20 C.F.R. § 416.920(a)(4)(v). If the claimant cannot make an adjustment to other work, then he will be found to be disabled. *Id.* Through step four, the burden remains with the claimant to prove he is disabled. *Brantley v. Colvin*, No. 4:10CV2184 HEA, 2013 WL 4007441, at *3 (E.D. Mo. Aug. 2, 2013) (citation omitted). At step five, the burden shifts to the Commissioner to establish the claimant maintains the RFC to perform a significant number of jobs within the national economy. *Id.* "The ultimate burden of persuasion to prove disability, however, remains with the claimant." *Meyerpeter v. Astrue*, 902 F. Supp. 2d 1219, 1229 (E.D. Mo. 2012) (citations omitted).

The Court must affirm the Commissioner's decision if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion. *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001). Determining whether there is substantial evidence requires scrutinizing analysis. *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007).

The Court must consider evidence which supports the Commissioner's decision as well as any evidence that fairly detracts from the decision. *McNamara v. Astrue*, 590 F.3d 607, 610

(8th Cir. 2010). If, after reviewing the entire record, it is possible to draw two inconsistent positions and the Commissioner has adopted one of those positions, the Court must affirm the Commissioner's decision. *Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir. 2012). The Court may not reverse the Commissioner's decision merely because substantial evidence could also support a contrary outcome. *McNamara*, 590 F.3d at 610.

## V. The ALJ's Determination

In a decision dated May 14, 2018, the ALJ found that Plaintiff meets the insured status requirements of the Act through December 31, 2021. Plaintiff had not engaged in substantial gainful activity since the alleged onset date, December 20, 2015. The ALJ noted Plaintiff received income of $8,932.47 in 2016 but such amount was from FMLA, vacation and benefit back pay, and a possible 401(k) payout. The ALJ further found that Plaintiff had the following severe impairments during the relevant time period: major depressive disorder, generalized anxiety disorder, obesity, mild osteoarthritis of the bilateral knees, and moderate osteoarthritis of the left thumb. The ALJ noted Plaintiff also alleged GERD, diverticulosis, and anemia; however, the ALJ found there was neither evidence of any treatment for those conditions subsequent to the alleged onset date nor an indication that those impairments impose any functional limitations. Additionally, Plaintiff also reported headaches and an enlarged prostate at the hearing. Nevertheless, the ALJ found there was no indication that those impairments have been diagnosed by a medically acceptable source or that Plaintiff has received treatment for those conditions.[2] (Tr. 15-16)

---

[2] The ALJ asserts that "there is no indication that [Plaintiff's reported headaches and enlarged prostate] have been diagnosed by a medically acceptable source or that [Plaintiff] has received treatment for these conditions." (Tr. 16) However, Plaintiff testified that one of the daily medications he takes is Flomax for his enlarged prostate. (Tr. 46, 49, 50, 259) The Court does

- 10 -

While Plaintiff did have severe impairments, the ALJ concluded he did not have an impairment or combination thereof that met or medically equaled the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ explained that Plaintiff's physical impairments do not satisfy the criteria of Listing 1.02. Furthermore, Plaintiff's mental impairment, considered singly and in combination, do not meet or medically equal the criteria of Listings 12.04 and 12.06. For example, his limitations are mild as they pertain to the following: understanding, remembering, or applying information; interacting with others; ability to concentrate, persist, or maintain pace; and adapt or manage himself. (Tr. 16-17)

After careful consideration of the entire record, the ALJ found that Plaintiff had the RFC to perform medium work as defined in 20 C.F.R. 404.1567(c), subject to limitations. These limitations include the following: inability to climb ladders, ropes, or scaffolds or be exposed to unprotected heights or hazardous work environments; occasionally climb stairs or ramps; occasionally stoop, kneel, crouch, or crawl; frequent handling and fingering with the left non-dominant hand; remembering and carrying out simple, routine tasks and making simple work-related decisions; cannot perform production-pace tasks that require strict hourly goals; frequent contact with supervisors and co-workers; occasional contact with the general public; and be off-task five percent of the workday to manage his emotions and for additional restroom breaks. (Tr. 17-18)

The ALJ noted Plaintiff alleges he is unable to work mainly due to his symptoms related to a mood disorder: suicidal ideation, social withdrawal, crying spells, irritability, feelings of hopelessness, poor concentration, decreased productivity, frustration, and anger. Plaintiff

---

not find this discrepancy is prejudicial as the ALJ's decision factors Plaintiff's admitted need for additional restroom breaks into her determination.

presented to an emergency room in December 2015 due to reported life stressors, which included wanting to harm the person at work who complained about him. He was referred to an Intensive Outpatient Program. The ALJ opined that treatment records from the program between January and February 2016 revealed mostly benign findings. While in the program, Plaintiff participated in group therapy and learned coping techniques and medication management. By February 2016, he reported he was doing better, not as depressed, and had a positive attitude. Mental status examinations showed he exhibited a normal appearance, relaxed posture, calm demeanor, cooperative attitude, good eye contact, normal psychomotor activity, normal speech, logical thought process, sad affect, intact memory, average intelligence, and good insight and judgment. (Tr. 18)

In making these findings, the ALJ gave great weight to the opinions of Plaintiff's treating psychiatrist, Dr. Graypel.[3] Dr. Graypel's notes from July 2016 show Plaintiff was generally doing okay but isolating. By June 2017, Plaintiff reported minimal crying spells, stability, satisfactory sleep, improved energy, and getting out of the house more. The final treatment notes from September 2017 show Plaintiff appeared clean and neat, with relaxed posture, normal motor activity, cooperative behavior, appropriate eye contact, normal speech, normal and goal-oriented thought processes, a depressed mood and affect, intact memory, normal intellect, average insight, and unimpaired judgment. (Tr. 18-19)

On the other hand, the ALJ gave little weight to the mental health status assessment of the state agency psychological consultant who found that Plaintiff's mental illness was non-

---

[3] As more fully explained below, the ALJ gave little weight to Dr. Graypel's letter dated February 8, 2017. (Tr. 373)

severe. The ALJ explained that, while the record did not reveal significant functional deficits over a prolonged period of time, subsequent evidence shows some difficulties. (Tr. 20)

The ALJ found that Plaintiff is capable of performing a range of medium exertional work despite his physical limitations caused by osteoarthritis of the bilateral knees and the left thumb. While x-rays showed moderate signs, there is no evidence of subsequent treatment for these issues. Likewise, there is no evidence of treatment for Plaintiff's claimed gastrointestinal issues. The ALJ did factor Plaintiff's obesity when considering his RFC. (*Id.*)

Furthermore, the ALJ noted Plaintiff and his wife reported a wide range of daily activities that are inconsistent with allegations of disability. For example, Plaintiff is able to care for himself; do some cleaning, shopping, and driving; watch television, read, and attend to his hobby involving slot cars; eat out at restaurants about once a week; navigate his basement stairs daily; and lifting his average-sized four-year-old grandson. (*Id.*)

The ALJ found that, while Plaintiff is unable to perform any past relevant work, his RFC is such that there are jobs in significant numbers in the national economy that he can perform. These jobs include night cleaner, bacon skin lifter, and laundry worker. Consequently, the ALJ concluded Plaintiff was not disabled within the meaning of the Act during the relevant time period. (Tr. 19-22)

## VI. Discussion

In Plaintiff's Brief in Support of Complaint, he raises two arguments: (a) the ALJ failed to fully and fairly develop the record and (b) the ALJ failed to properly evaluate his RFC. The Commissioner responds that the ALJ's determination is supported by substantial evidence. Furthermore, the Commissioner argues the ALJ properly assessed Plaintiff's RFC.

### (a) Development of the record

Plaintiff first argues the ALJ failed to fully and fairly develop the record. Plaintiff conclusively asserts the Commissioner did not order a consultative examination or a medical expert to review the evidence and that could have provided a medical opinion that addressed Plaintiff's physical ability to function in the workplace.

"[T]he ALJ is not required to function as the claimant's substitute counsel, but only to develop a reasonably complete record." *Whitman v. Colvin*, 762 F.3d 701, 707 (8th Cir. 2014) (quoting *Clark v. Shalala*, 28 F.3d 828, 830–31 (8th Cir. 1994)). With regard to consultative examinations, "[t]he ALJ is required to order medical examinations and tests only if the medical records presented to him [or her] do not give sufficient medical evidence to determine whether Plaintiff is disabled." *McCoy*, 648 F.3d at 612 (citation omitted). Reversal of an ALJ's decision because of a failure to develop the record is not warranted "absent unfairness or prejudice." *Onstad v. Shalala*, 999 F.2d 1232, 1234 (8th Cir. 1993).

The Court is sympathetic to Plaintiff's argument that his lack of health insurance prevented him from seeking additional treatment for his impairments and, thus, caused the relative dearth in medical records. Nevertheless, the ALJ could only evaluate his claimed disability based on the record before her. Likewise, the Court can only review the ALJ's decision in the context of the totality of Plaintiff's records and the testimony presented at the hearing.

The Court finds that the ALJ sufficiently developed the record in this case. The ALJ fully considered the x-rays of the bilateral knees and left thumb that revealed mild osteoarthritis in making her determination that Plaintiff suffers from severe physical impairments. Ultimately, she found that the totality of the record – including Plaintiff's testimony about his ability to stand

for six and a half hours during an eight-hour workday if allowed breaks to sit and his testimony about his daily personal activities – did not support a finding of disability.[4] Therefore, the ALJ did not breach a duty to develop the record because the record contained sufficient evidence from which to make an informed decision. *Ulrich v. Astrue*, No. 2:10CV89 JCH(LMB), 2011 WL 7401681, at *13 (E.D. Mo. Dec. 2, 2011). Thus, the Court concludes that substantial evidence based on the record as a whole supports the ALJ's determination that Plaintiff is not disabled.

### *(b) RFC determination*

Plaintiff next argues the ALJ failed to properly evaluate his RFC with regard to his ability to perform medium work with frequent contact with supervisors and coworkers. He claims the nature of his resignation from his previous job, including him wanting to harm his former supervisor and coworkers and receiving subsequent psychiatric treatment for anger issues, should preclude such an RFC determination.

Specifically, Plaintiff complains the ALJ should not have given "great weight" to Dr. Graypel's opinions from February 2016.[5] In the February 2016 form, Dr. Graypel noted Plaintiff had no limitations in his ability to understand, remember, and carry out simple and complex instructions, and make judgments on simple or complex work-related decisions. Dr. Graypel further noted Plaintiff had none-to-mild limitations in his ability to interact appropriately with

---

[4] Plaintiff also argues the ALJ erred in not asking the VE whether a hypothetical individual as previously described would be precluded from the stated jobs if that individual was limited to only occasional (as opposed to frequent) handling and fingering with the left, non-dominant hand. The ALJ was not required to ask the VE about every conceivable hypothetical individual. Furthermore, the Court notes that Plaintiff's counsel could have asked the VE about such a so-limited hypothetical individual as well.

[5] It bears noting the form dated February 18, 2016 was provided by the Social Security Administration Office of Disability Adjudication and was signed by Dr. Graypel one day after Plaintiff protectively filed an application for DIB on February 17, 2016. (Tr. 146)

coworkers and the public and to respond to usual work situations and to changes in a routine work setting. However, Dr. Graypel did note Plaintiff had mild limitations in his ability to interact with supervisors. Dr. Graypel specifically noted Plaintiff "is constantly dealing with depression and anxiety issues," which have required adjustments to his medications. (Tr. 369-70)

Plaintiff argues Dr. Graypel's opinions as stated in the February 2016 form should be given little weight. The Eighth Circuit has "recognized that a conclusory checkbox form has little evidentiary value when it 'cites no medical evidence, and provides little to no elaboration.'" *Anderson*, 696 F.3d at 794 (quoting *Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010)). *See also Taylor v. Chater*, 118 F.3d 1274, 1279 (8th Cir. 1997) ("[RFC] checklists, though admissible, are entitled to little weight in the evaluation of a disability."). Furthermore, Plaintiff argues the February 2016 opinion is not supported by Dr. Graypel's own treatment notes and notes from the Intensive Outpatient Program. Specifically, Plaintiff cites the February 8, 2017 letter from Dr. Graypel in which he asserts that Plaintiff's "medication condition prevents him from being employed at this time, and even from looking for employment comparable with his education and experiences." (Tr. 373) According to Plaintiff, this letter one year later shows Dr. Graypel had changed his opinion on Plaintiff's mental condition.

The ALJ explained that the February 2016 letter is consistent with other treatment notes that documents gradual improvement since December 2015. Dr. Graypel's treatment notes from September 7, 2017, the latest in the record, show Plaintiff reported he was on an "even keel and having minimal crying spells." He had resumed taking one of his medications and said his energy level had improved, sleep was okay for the most part, and that he wanted to continue all of his medications unchanged. He also expressed an interest in support groups. (Tr. 483)

Additionally, Plaintiff appeared clean and neat, with relaxed posture, normal motor activity, cooperative behavior, appropriate eye contact, normal speech, normal and goal-oriented thought processes, a depressed mood and affect, intact memory, normal intellect, average insight, and unimpaired judgment. (Tr. 485-86) The Court finds these months' long notes from Plaintiff's treating psychiatrist provide substantial evidence for the ALJ's determination.

The ALJ explained she gave Dr. Graypel's letter dated February 8, 2017 little weight because his cursory statements therein are inconsistent with his other treatment notes. Furthermore, the ALJ found, and the Court agrees, that the February 2017 letter improperly invades the province of the Commissioner. *See House v. Astrue*, 500 F.3d 741, 745 (8th Cir. 2007) ("A treating physician's opinion that a claimant is disabled or cannot be gainfully employed gets no deference because it invades the province of the Commissioner to make the ultimate disability determination.").

Plaintiff has earnestly explained the problems he faced at his previous place of employment. Specially, the difficult relationship he had with his supervisor and other employees that seem to have been present for many years. However, the record does not support a finding that Plaintiff's admittedly severe mental impairments will reasonably lead to similar problems in a new workplace. The many months' worth of notes from his treating psychiatrist demonstrate Plaintiff has made significant improvements since December 2015. "An impairment which can be controlled by treatment or medication is not considered disabling." *Estes v. Barnhart*, 275 F.3d 722, 725 (8th Cir. 2002) (citation omitted); *see also Brace v. Astrue*, 578 F.3d 882, 885 (8th Cir. 2009) ("There is substantial evidence that, when taken as directed, the medication [plaintiff] was prescribed was successful in controlling his mental illness.").

Based on this analysis, the Court finds that the ALJ did not commit reversible error and her decision is supported by substantial evidence in the record. It is undisputed that Plaintiff suffered from multiple physical and mental impairments during the relevant time period. However, that was neither the sole issue before the ALJ nor the issue before the Court now. Based on the totality of the record, the ALJ determined that Plaintiff could perform a range of medium exertional work subject to the limitations discussed above. The Court finds that substantial evidence supports this conclusion, including the medical records discussed above as well as Plaintiff's and the VE's testimony at the hearing.

Accordingly,

**IT IS HEREBY ORDERED** that the final decision of the Commissioner of Social Security denying Social Security Benefits is **AFFIRMED**. An appropriate Judgment shall accompany this Memorandum and Order.

Dated this 30th day of March, 2020.

**RONNIE L. WHITE**
**UNITED STATES DISTRICT JUDGE**